Good morning, Your Honors. May it please the Court, Joanna Scavoni on behalf of the appellant David Pride. Mr. Pride has been waiting for more than six years to receive medical treatment duly prescribed by six treating physicians, but that treatment has been improperly delayed or outright denied by prison officials and administrators at Calipatria. The delayed and denied treatment has caused Mr. Pride to suffer exacerbated injuries and excruciating pain. After exhaustive efforts to get medical treatment, Mr. Pride filed this pro se lawsuit, which he diligently prosecuted before the District Court. But the District Court erroneously dismissed his injunctive relief claims and prematurely adjudicated his damages claims on summary judgment. Doing so denied Mr. Pride the day in court that this case merits. Today I plan to address three main arguments. First, the District Court's improper dismissal of Mr. Pride's injunctive relief claims and the role of the Plata v. Brown class action. Second, the Court's erroneous grant of summary judgment on the monetary claims as to Nurse Correa, Dr. Levin, Dr. Santiago, and Warden Ochoa, despite the existence of disputed material facts. And third, time permitting, I'll address the District Court's improper denial of Mr. Pride's request to conduct additional discover under Rule 5060. First, I'll address the District Court's erroneous dismissal of Mr. Pride's injunctive relief claims in which he sought to enjoin the denial of medical treatment and to enjoin further retaliation or hardships against him. And to date, this issue has been addressed at the District Court level, and decisions have gone both ways. Counsel has only located one published case on it. There's no Ninth Circuit authority on the scope of either a 12b6, 12b1, or inherent discretion judgment on this issue. So turning to the issues in this appeal, in their motion to dismiss, the government argued that it was a failure to state a claim. The District Court dismissed for lack of subject matter jurisdiction under 12b1. So the standard of review on appeal is de novo, despite the Attorney General's argument in their respondent's brief that it's an abuse of discretion standard. I think it's well established that it's either going to be the 12b1 or 12b6 motion would be de novo review. And the District Court erred. Let me just ask you a couple questions. Sure. On this subject of injunctive relief, the District Court dismissed Pride's claim for injunctive relief. Am I correct in this? Because it was already provided for in a pending class action, Plata v. Schwarzenegger? That is the justification that the District Court provided. But our argument, Your Honor, is that it's not actually provided for in the Plata v. Brown case. In this circumstance, Mr. Pride has alleged or alleged a claim for injunctive relief that's specific and individualized to him in his medical treatment. And our argument is that that falls outside the scope of what is prohibited under the Plata stipulation. Paragraph 29 of the Plata stipulation specifies that it's only to be used for res judicata or issue preclusion purposes in cases that are seeking class-wide or systematic relief. And so that was the circumstance in the District Court relied on, but that's not the case here. Fine. I'm just tossing these issues at you. Now, what about Dr. Levin, Dr. Santiago, and Warden Ochoa? They've retired or they've been transferred. What about this thought that injunctive relief may be moot as to them? So the cases that the Attorney General relied on were cases in which a defendant Well, forget about what the Attorney General relied on. Just tell us what your position is. Our position is that even if it's moot as to those transferred defendants, it's not moot on the whole, and that that would actually be better left for the District Court to address on remand. But that it's not moot because Nurse Correa is still there. He's still being denied treatment. I just asked you the question. Is it Levin, Santiago, and Ochoa? So with respect to those defendants, while there's no clear authority, we'd be willing to agree that it's moot as to prospective injunctive relief as to their conduct. That's all right. You've got a lot of issues to go through, and you've got nine minutes and 49 seconds. Thank you, Your Honor. So with respect to the injunctive relief claim, it's also not It doesn't fall within Crawford v. Bell, because, as I was saying before, it's a claim for individualized, specific relief. Yeah. Well, we've gone through that. Okay. So turning to the second issue, the summary judgment and the deliberate indifference claim, with respect to the District Court's improper adjudication of facts and weighing of the credibility of evidence, we would submit that there were a number of disputed facts with respect to each of the four defendants, and that summary judgment was improper. With respect to Nurse Correa, it was improper because there's evidence in the record in light of her participation in the Crono Committee. If you view that light in the evidence most favorable to Mr. Pryde, it leads to the inference that she was an active participant, or at least that it's a jury question, that she actively participated in that decision-making process, which denied him access to medical treatment. Specifically, with respect to the second-level appeal, the appeal document indicates that she reviewed Well, let me ask you this. Does the record have any evidence that the Crono Committee's when it denied summary judgment, that the denial was based on denied relief, that that was based on, did they indicate any medical reasons for that? They did not. And it's only a clear picture of who that participating committee was, and nor has the Attorney General ever identified. But to answer your question, Judge Progerson, there's no specific rationale given. In a post facto way, Dr. Levin, in his declaration, has attempted to say that it was based on a lack of physical exam, at least his concurrence with the committee, that it was a lack of a physical exam performed by Dr. Santiago. But Dr. Santiago's declaration indicates he did perform a physical exam, and the medical notes, if you read his various physician's orders, it's nearly impossible to make out what all of the physician's orders say, and that's exactly the kind of issue that should have gone to a jury to decide what the scope of the recommendation was, and what the denial was by the Crono Committee, if there was any rationale, and whether or not that led to deliberate indifference. So the Crono Committee, again, we don't know who they were, what their qualifications were, how many of them were this deciding committee, but what the case law clearly demonstrates is that when you have what the Attorney General suggests is a difference of opinion, that's not the case here. We don't have simply a Sanchez case, which is what the district court relied on. We don't have one doctor and all of the other side. We have six different treating and specialist physicians who examined Mr. Pryde over the course of six years who have recommended treatment, and that decision has been overruled by prison administrators and Dr. Levin, who is a non-treating, non-specialist physician. And under the case law, that kind of dispute or disagreement should have gone to a jury. Kennedy. What about the mattress problem? So that is the ongoing relief that my client has yet to receive. He did receive the knee sleeve, so there were two questions here. But with respect to the mattress, he still has not received it to date. He has, as we explained in our brief and what has happened subsequently, he has continuing exacerbated. This is the egg crate? Yes. He hasn't received any kind of mattress. He has not received it to date? That's true. And no egg crate mattress. And what that does is that actually reduces the ability to utilize the other accommodations, like the C-spine pillow, the lumbar pillow, that had been prescribed by other physicians, because they can't properly be used as accommodations without proper mattressing. And so as to the ongoing nature of the denial. Dr. Santiago, he wrote a chrono for Pryde to receive the mattress. Is that right? He omitted it from his initial chrono, but it was in his physician's orders. And the chrono committee considered that as if it were in the chrono. Okay. And the warden didn't deny Pryde an egg crate mattress, did he? Well, the warden, the policy that the warden set was, Your Honor, you're correct, was with respect to double mattresses. But we would submit that the warden is aware of grievances, the warden is aware of the medical treatment, and his declaration is not dispositive on the issue of whether or not he was aware that Pryde never received the alternative treatment, which is the egg crate mattress. So we would submit there are fact questions with respect to warden Ochoa, in addition, that there is also, although I realize that we didn't cite it in our brief, there is evidence in the record that my client's wife wrote a letter to warden Ochoa notifying him. So he was certainly, based on the evidence in the record, on notice of the conditions and the medical treatment my client was not receiving. They had a ban, the warden had a ban on double mattresses. Yes. Are you disputing that? No. Okay. And so the argument, the opposing argument has been that that's sufficient and that that insulates warden Ochoa from liability, but it doesn't because he had knowledge, or at least there's a fact question as to whether he had knowledge, that Mr. Pryde was denied any alternative treatment in that he's still to date been denied the egg crate mattress. So what we're asking is that the warden denied Pryde an egg crate mattress? He had he there was a question, Your Honor, a fact question as to what knowledge he had that Mr. Pryde was being consistently denied that treatment. So, yes, I would submit that there is a fact question that he, his declaration says that as of March 2006, Nurse Garcia discussed with him this case and the mattress policy as applied to Pryde, and it never clarifies at what time he became aware Mr. Pryde was being denied any mattress. But because Mr. Pryde filed a number of grievances and the inference is that the warden of the prison is aware of those grievances and case law supports that, there is a question of fact as to his knowledge of the denial of that treatment. Now, turning to discovery, there's a contention that the district court abused its discretion by interpreting Rule 56-F to permit a continuous to obtain discovery from defendants, not third parties. Yes, exactly. And because it's an error of law in that the court misunderstood what kind of additional discovery, that amounts to an abuse of discretion. And we cited a number of cases in which third-party discovery was permitted under a 56-F. All right. So I think you've covered it all now. Okay. There are no further questions. And you've got a minute and 50 seconds left. I'll reserve the remainder. Okay. Thank you. May it please the Court, Your Honors. I'm supervising. What is it that takes all this time for the prison system to see to it that a prisoner gets the equipment and the treatment that the prisoner, the doctors say the prisoner ought to have? You know, you can buy an egg crate mattress, what, for $2, $3? Your Honor, the evidence in the record is this, that the egg crate mattress, first of all, was not included on the request to the Crano Committee. The committee did, however, look at that because it was in the physician's orders. And their determination was that there had not been a thorough enough examination by Dr. Santiago to warrant it. And I would tell you that at Calipatria, the policy is that egg crate mattresses are reserved for primarily quadriplegic inmates for pressure point type of injuries or high risk of having pressure injuries like ulcers to the skin. So in terms of the egg crate mattress issue, that's the basis of it. Those are reserved for patients who are bedridden. And that was made known to Inmate Pride repeatedly, even by Dr. Santiago. Now, Inmate Pride has been given the C-spine pillow, the lumbar pillow, and he's Well, you know, we have tremendous problems with the delivery of medical care to prisoners in our California prison system. Right? Well, I would submit, Your Honor, that that certainly has been in the past, which is how we ended up with Plata and a receiver in charge of the medical position. It's not so much anymore because the receiver is overseeing it and because Plaintiff's Class Counsel is addressing inmate issues, including individual issues, on a monthly basis. It takes a Federal court order to get the prison system to do what it ought to be doing. I guess That's the truth. Well, I think certainly that is supported. The truth will make you free. Yeah. That is certainly supported by what has happened in Plata, yes. Absolutely. Can you tell us who made up the Crono Committee? I don't know, Your Honor. Why shouldn't we know that? I don't know, but I would tell you. It's potential that you might want to know it, but the problem is this. The information at the time of the summary judgment motion was that the Crono Committee was made up of physicians. Well, now, I know this one person who was not a physician that was on it, and that was a nurse. Yes, and she was not The nurse had no qualifications to be on it, but she was on it. She was not, quote, on the committee in the sense of making a decision. She was voting on it, wasn't she? No, she was not. She did not vote? The only thing her declaration says is that what she was there to do was to write down the decision and to, on behalf of Dr. Levin, sign off on what the committee decided. Sign off? I think that sounds like she voted. No, she did not make the decisions on his medical care, Your Honor. Well, what does signing off mean? Well, when the committee, for example, in this case, there were several types of issues that were before the committee, a lower bunk, a lower-level cell, soft-soled shoes, bilateral knee braces. The mattress wasn't on it, remember. So when the committee decided that the actual Crono should issue, which is an order saying that this inmate should have this particular treatment, that Crono has to be signed by the chief medical officer. And in this case, it was his representative simply to sign on the Crono for him, but she didn't make the decisions. Well, I'm very skeptical of that. She's there and she signs off representing the chief medical officer? Yes, only him because he was the one that had to authorize or affirm what the committee decided. Who else was on that committee? It indicates that the declarations indicate that it was the physicians, primary care physicians that were on duty that day and that they were the ones that decided it. Are there names there? They are not listed on that report, no. It's simply signed off. They don't know who they were. No. And to be candid, the plaintiff did nothing to try and ascertain that. Is that the way to run a railroad? No, it is not. Okay. It is not. There was no discovery, and I have to point out the fact that the discovery period commenced, it terminated, the plaintiff had repeated extensions to conduct discovery that amounted to an additional period of more than seven months to find out further information. And, in fact, he filed a summary judgment very early in the case that was denied by the district court. There is nothing in the record, including a declaration from the plaintiff that disputes the evidence that registered nurse Correa was simply there to write down the committee's decision, the committee of physicians. When she did that, did she, on that piece of paper, write down who the members of the committee were who had led the meeting? Yes, there are initials on the chrono form that looks like there were two physicians. I don't know, I can't tell you who those initials are, but where it indicates on the bottom that she's signing on behalf of Dr. Levin and that the decision was by the chrono committee, there are two sets of initials on that report, neither of which is hers. And the undisputed evidence before the district court was that nurse Correa was not designated to and did not consider any of the medical issues concerned with that decision where the chrono committee denied him the bilateral knee braces. I think that's a matter that could be tried to a jury. It can't be, Your Honor, because the evidence of that is the declaration of nurse Correa, who was there, and that of Dr. Levin, who sent her simply to sign off on any chronos that got issued. The difference is how you read this document, and I can already see that you could dispute how the document sounds. Anyway, that's what we decided later. Yeah. We would still submit that that's certainly not the evidence before the district court in this case. Your Honors, I do want to talk briefly about, and I take it from this, that the court's order where you appointed counsel asked about the issue of a difference of medical opinion and whether Dr. Levin had a difference of medical opinion as compared to Dr. Santiago. What we're talking about here is what was, number one, at the time when the chrono committee met. We know that Dr. Levin was not present for the committee meeting. He later reviewed at the second formal level, and he was informed by those sitting on the chrono committee that the reason they determined the actual medical need for the bilateral knee braces and an egg crate mattress, or what was a double mattress, prohibited under that policy. And so at that point, it's plausible that the district court, and it's reasonable, that their finding was with basis, and that is that the denial of the bilateral knee braces by the committee was a different decision than Dr. Santiago had simply recommended. And if you look at the medical records in the record, it's very clear that they don't tell you anything, and they didn't tell the committee anything, and they didn't tell Dr. Levin anything when he reviewed it at the second formal level of the appeal, because it doesn't say, and doesn't remark on what was the testing done to determine whether he needed this equipment. In fact, it would have been deficient on his part had he just simply issued a piece of equipment that maybe wasn't necessary, that could have been more harmful to him than helpful. Maybe he should have gone to the meeting instead of sending the nurse. Again, that's speculation, Your Honor. There's nothing in the record about that. And there was about the reason that he couldn't be at the meeting. And I think, well, in part, there's a lot of different jobs that he does, but that's not an issue that's relevant towards the finding in the summary judgment motion. He simply wasn't there. That notwithstanding, even if you find that there was a difference of opinion, along the line of cases of Hamilton and most recently in May, this Court's decision in Snow, the reason for the denial has to do with his medical needs. It had nothing to do with some other consideration of cost or, in the case of Snow, such an egregious situation where the warden said, oh, he's on death row. Don't do anything special for them. Let him die. There'll be more to come along. That wasn't this case. All that was done where the committee would say, we need to see more information to tell us whether this is medically acceptable and necessary equipment. They advised him three times to go back to his primary care physician for reevaluation and to get the proper chronos issues to consider again. And he didn't do that. And he, as noted in the second formal level grievance, he had been to see Dr. Santiago twice and never once raised the issue of, I'm having back pain. I'm having problems. I need a knee brace. I need a crepe mattress. Never. So we have to look at the whole picture here, which is that the doctors did not engage in conduct, which this Court has said in both Hamilton and Snow, could rise to a difference of medical opinion that may constitute a deliberate indifference claim when one doctor disagrees with another. It simply isn't that. There was no, really no, quote, disagreement in essence. It was, we need more information. That does not amount to a complete denial or interference on the part of Dr. Levin. And plaintiffs talking about other doctors seeing him later and making the issues that form the basis of the complaint in this case. And it's not relevant to this discussion. And second of all, even if you looked at, for example, Dr. Young's recommendation, all it says is surgery isn't warranted. Why don't you just go ahead and give him a double mattress? That doesn't, again, indicate any examination to fully come up with why that's necessary. But Dr. Levin, and there's no evidence that Dr. Levin, Dr. Santiago, and Nurse Correa had anything to do with his care after that point in time that formed the basis of the complaint. What we're talking about here is January 2006. And that has to stay within that time frame. Your Honors, I just want to briefly touch on the injunctive relief issue in this case. In fact, the injunctive relief should be dismissed based upon the existence of the plata class action. And, Your Honor, we would submit that that determination was proper. There is nothing, this Court, specifically in Crawford v. Bell, tells us that a court may choose not to exercise its jurisdiction when another court having jurisdiction over the same matter has entertained it and can achieve the same result. So that is something that was discretionary on the part of the judge. And it cannot be said that the discretion was abused in this case. And even the system in the plata stipulation that allowed individual inmates to take advantage of the stipulation? Yes, Your Honor. Was there a separate process for them? Yes, Your Honor. And to be ---- And that there's some system that would deal specifically with an individual inmate's particular concerns? Yes, Your Honor. There is. Expeditiously? Yes. And, in fact, it's very expeditious, Your Honor. What is that provision? If you look at paragraph 13 of the plata stipulation, it indicates that the defendants continuously post notices informing all inmates at each institution that complaints regarding the provision of medical care may be sent to counsel for the plaintiff class in this case. Those notices are posted at every prison in the State. So the notices are there. There's not ---- And the notices provide that individual inmates can contact class counsel. And, in fact, in this case, Mr. Pryde, in opposition to the motion to dismiss, submitted documents that showed that he did just that. And ---- So then class counsel with all ---- how many prisoners are in the State system? Thousands. Hundreds of ---- probably 100,000, maybe less now with the releases. But, yes, in fact ---- So class counsel is going to reach out to, you know, thousands of inmates. They do, in fact. Who may need immediate medical attention. Yes. And they do, Your Honor. In fact, I've worked on the plata class action. And I can tell you that that is exactly what happens on a daily basis. These class counsel are down in the weeds, as is the receiver, every day in medical care issues in this State. They meet monthly with the prisons and the medical supervisors to address issues. And, yes, they address very serious issues on a daily basis. Did the class counsel have the authority to direct the local prison to provide medical ---- certain kind of medical care? The class counsel has the authority to advocate for an individual inmate to the receiver. And the receiver, appointed by the federal court, is the one who has the authority to direct those prisons to give particular care. Yes. Has there been a substantial improvement? Yes. There has been, Your Honor. And I would ---- So in this particular case, then, the receiver could have ---- had the matter gotten to the receiver, you're telling us that the receiver could have ordered the local prison to give him an egg crate mattress? Absolutely. If the receiver found that it was warranted. Despite the warden's policy? Well, the warden's ---- Despite the warden's policy at the local prison, he would have to adhere to what the receiver said. Is that what you're telling me? Well, no, no, no, no. And the egg crate mattresses were not covered by the double mattress policy. There's a difference, Your Honor. The double mattress ---- So you said a minute ago that the warden's policy was limited to a certain ---- a prisoner who had a certain kind of limitation. No. Not necessarily the warden's policy when we're talking about the egg crate mattresses and how those are used. The warden's policy at issue in this case is that you can't have two mattresses, double mattresses. And that's purely for safety and security reasons. The warden's policy in this case did not preclude the use of egg crate mattresses. It's the medical ---- Even for ---- even assuming that all the doctors had unanimously agreed that the plaintiff here needed the mattress. Right. And if they could have ---- if they felt the medical professionals ---- and in this case, let's talk about in terms of the receiver. If Mr. Pryde, which he did contact the prison law office, who told him, by the way, send the stuff to us and we'll look at it. His exhibit filed in opposition to the motion dismissed says that. We'll look at it and we'll advocate for you in our monthly meetings. Okay. So we have that, number one. But if he had done that and said, I need an egg crate mattress, plaintiff's counsel would have advocated for him and the medical staffing at the receiver's office, because they do have medical care professionals there. They would have taken the issue up. And had it been warranted, yes, they would have ordered the prison to give him an egg crate mattress. So, yes, that relief can be afforded through PLATA. And that's why the mechanisms are in place. And that's why at every prison it's posted, because they want to be able to report to the courts whether compliance is being achieved or not. Moreover, Your Honor ---- Why did anyone from counsel's office contact this prisoner of pride and say, hey, we've got a case pending and we'll come by to see you and find out what your problem is and we'll see if we can't expedite it? Well, Mr. ---- Did they do that? I don't know, because there's nothing in the record. But what I do know is this. Mr. Pride wrote to the prison law office, who is the plaintiff's class counsel in PLATA, along with private counsel. And if you see, there's an exhibit that Pride filed. It's in the record at 596, where he supplies the letter that was in response to a letter he wrote in February 2008. That's when he chose to take it up with the plaintiff's counsel. And it was only in response to the motion to dismiss filed in this case. So when he did that and he contacted the prison law office, they told him, quote, you have the option of submitting your exhausted appeals and documentation for our review in order for us to determine whether we are able to advocate on your behalf during our monthly conference calls with health care managers at CDCR's institutions. He was specifically advised by the prison law plaintiff's counsel, get us your materials and we'll advocate for you. So he got a letter, a notice? Yes. He received a notice from the prison law office, and that is in the record again at 596 in this case. Who runs the prison law office? The prison law office, well, the main counsel is Don Spector, who works there at the prison law office. He's the one that oversees the class action. And then, of course, there are various attorneys under him. Well, who does he work for? He works at the prison law office. It's a separate legal entity that advocates in various inmate class action cases. It's like a civil rights kind of group. They were appointed class counsel by Judge Henderson in the Plata case, as were some other private counsel from a firm called Hanson Bridget in San Francisco. So they all oversee, sorry, not Hanson Bridget. Sorry, the name is escaping me now. But there's a whole slew of prison counsel that were appointed by Judge Henderson to represent the plaintiffs in class action. Your Honor, I would also just point out briefly that on the injunctive relief issue, Mr. Pryde sued these people in their individual capacities. We've already had a stipulation or agreement that three of the four defendants who are no longer at the prison are not active for this injunctive relief claim, so thus we talk only about Judge Correa. She was sued in an individual capacity. She has no authority over the medical care to be provided to any inmate in the prison, and therefore, even to reverse for an injunctive relief claim against her would be pointless at this juncture. And lastly, Your Honor, let me just touch briefly on the other things. You know, you're way over your time. Oh, I am. I apologize. Sorry, Your Honor. Why don't you just finish quickly? Okay. The only thing I would wrap up saying is that the district court's judgment should be affirmed in all respects based on the entire record before it. Thank you, Your Honors. Thank you. Thank you, Your Honor. First, I'd just like to say that in pulling up the most recent filings in the Plaza case on Kaser, it's evident that the Attorney General's filings from just last November in their benchmark reporting that they're not going to meet the benchmarks, and they asked for the court to modify the order. They're significantly overcapacity. They can't even meet 140 percent of what the prison capacity is going to be, and that's in November. So it seems, although some progress has been made, it's still a dire situation. Looking to the letter that the court was just discussing with counsel, the letter actually, the crux of the letter. Why don't you read it? What were you just talking about so fast? Oh, these are the most recent Kaser filings in the Plaza class action. It's the benchmark reporting. And I'm happy to. So the Attorney General's filing was docket number 2494, 2004-94. So just read what you just. Oh. Slowly. So this is the defendant's November 2012 status report and motion to modify June 30, 2011 order requiring interim reports. And the defendants are submitting the report and indicating to the court that as of November 17, that the population of prisoners in California is at 150.7 percent of design bed capacity. And that is above the benchmark that they are supposed to be meeting, and they're asking the court to modify the benchmarks. And so on the point that progress has been made, it's going very slowly, and even the Attorney General admits that they are not going to meet the court's orders to reduce the prison population. And turning to the specifics of this case and the dialogue the court was having with counsel about the prison law office and their capacity, the letter that counsel pointed to at Excerpt of Record 596 actually specifically advises Mr. Pryde that he can seek individualized injunctive relief in the courts, and that he should feel free to do so because the Plata stipulation, paragraph 29, does not bar him from seeking that relief. He has also named Doe defendants in this case, and to the extent that there is ongoing denial of treatment, even if the other defendants who have been transferred from the facility have left and are not interfering or denying treatment, we submit that with the presence of Nurse Correa and the Doe defendants, that that claim does merit being returned to the district court for adjudication on the injunctive relief. And then if I realize I'm over time, but if the court wants to hear further, I'm happy to address some of the other points that came up in argument. I think we're fine. Okay. Thank you. Thank you very much.  This matter is submitted.
judges: Pregerson, Noonan, Paez